IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-547

No. COA21-85

Filed 16 August 2022

Wake County, No. 18 CVS 15139

DAVID BEAVERS, Plaintiff,

v.

JOHN MCMICAN, Defendant.

Appeal by Plaintiff from an order entered 14 October 2020 by Judge Keith O. Gregory in Wake County Superior Court. Heard in the Court of Appeals 5 October 2021.

*Matheson and Associates, PLLC, by John R. Szymankiewicz, for plaintiff-appellant.*

*Shannon Poore for defendant-appellee.*

MURPHY, Judge.

We will not consider documents on appeal that were not before the trial court for its consideration of summary judgment. Here, although both parties at a hearing verbally referenced the contents of two depositions, the certifications of which were pending, we do not consider the depositions in determining whether the trial court erred because they were not proffered to or considered by the trial court.

A trial court errs in granting a movant's motion for summary judgment where there exists evidence on the record that, when viewed in the light most favorable to

the nonmoving party, could support each element of the alleged offense. With respect to alienation of affection and criminal conversation claims, acts by a defendant occurring after a plaintiff and former spouse have permanently separated may only be used to satisfy that plaintiff's burden of production for purposes of summary judgment insofar as they corroborate acts that occurred prior to separation. Here, where acts by an unknown party satisfied Plaintiff's burden of production with respect to the final elements of alienation of affection and criminal conversation and other evidence—including, in part, post-separation conduct—tended to show the unknown party was Defendant, Plaintiff satisfied his burden of production. Accordingly, the trial court erred in granting Defendant's motion for summary judgment.

## BACKGROUND

This action was initiated on 13 December 2018 when Plaintiff David Beavers filed a civil complaint in Wake County Superior Court asserting claims for alienation of affection and criminal conversation against his ex-wife's alleged paramour, Defendant John McMican. The relevant facts of this case, detailed below, are not in dispute.

Plaintiff and his ex-wife, Alison Beavers, married on 23 October 2004. On 18 January 2016, Plaintiff discovered texts on Alison's phone in which she had sent nude pictures to a person identified as "Bestie." Alongside the pictures, Alison and "Bestie"

had exchanged messages appearing to reference an instance of sexual intercourse that had occurred prior to the exchange of messages and pictures. At the time, Plaintiff did not look at the number associated with the contact information or otherwise take steps to discover the identity of "Bestie."

¶ 5 Upon discovering the exchange, Plaintiff briefly confronted Alison, then left his and Alison's home to stay with his parents. Upon Plaintiff's return several days later, he and Alison had a conversation about the affair. Alison explained to Plaintiff that she had engaged in sexual acts with the person identified as "Bestie" but that the two did not have sexual intercourse. Alison further professed that her paramour's name was "Dustin," one of her co-workers.

¶ 6 Several more weeks passed, and Plaintiff, skeptical of Alison's story during the first conversation, accused Alison of engaging in sexual intercourse with another man. Alison, in response, told Plaintiff she *had* engaged in sexual intercourse with someone from her workplace; however, she did not specify it was the person she had previously identified as "Dustin." Plaintiff never discovered Dustin's identity, and he suspected that, based on the absence of any "Dustin" in Alison's contacts, "Dustin" was a pseudonym. Plaintiff and Alison permanently separated on 16 December 2016.

¶ 7 Three and one-half months later, on 1 April 2017, Alison openly began dating Defendant, one of her co-workers. The two had known one another through work since the Summer of 2011. The Record indicates they had a close relationship,

exchanging ninety-eight texts and calls in October of 2016 alone, as well as interacting via phone and Facebook numerous times outside of that month. While the two admittedly became both romantically and sexually involved upon beginning their relationship, no direct evidence of romantic involvement between Alison and Defendant exists before the start of their relationship in April 2017, and both have expressly disavowed being romantically involved prior to that time.

¶ 8        On 13 December 2018, Plaintiff sued Defendant on theories of alienation of affection and criminal conversation. Defendant, in turn, filed a *Motion for Summary Judgment*, arguing Plaintiff presented insufficient evidence of at least one element of both offenses.[1] The trial court conducted a hearing on Defendant's motion on 17 August 2020, during which both parties referenced, without objection, recent depositions of Alison and Defendant's ex-wife, Jessica McMican. However, neither deposition was certified until 20 August 2020, three days later. The trial court entered an order on 12 October 2020 granting Defendant's *Motion for Summary Judgment*, and Plaintiff timely appealed.

¶ 9        On appeal, Plaintiff submitted a supplement pursuant to Rule 11(c) of the Rules of Appellate Procedure containing, *inter alia*, the depositions of Alison and Jessica discussed by counsel during the hearing. We entered an order to the trial

---

[1] The primarily disputed elements of both offenses are discussed in the analysis section of this opinion. *See infra* at ¶¶ 18-20, 25.

court on 23 November 2021 inquiring which, if either, of the depositions the trial court considered in granting Defendant's *Motion for Summary Judgment*; and, in response, the trial court filed an *Amended Order Granting Defendant's Motion for Summary Judgment* on 3 March 2022 confirming it considered neither of the two depositions.

## ANALYSIS

On appeal, Plaintiff contends the trial court erred in granting Defendant's *Motion for Summary Judgement* with respect to his criminal conversation and alienation of affection claims. First, however, Defendant argues that the documents in Plaintiff's Rule 11(c) supplement are not properly before us. Accordingly, we first address whether Plaintiff's proffered supplement is properly before us under Rule 11(c), then we address whether the trial court erred in granting Defendant's *Motion for Summary Judgment*.

## A. Rule 11(c) Supplement

Defendant contends that, under Rule 11(c) of our Rules of Appellate Procedure, "[t]he purported evidence contained in the Rule 11(c) supplement should not be considered on appeal as some evidence was not presented to the trial court for consideration . . . and other evidence contained in the supplement is irrelevant."

Rule 11(c) states, in relevant part, as follows:

> Amendments or objections to the proposed record on appeal shall be set out in a separate paper and shall specify any item(s) for which an objection is based on the contention that the item was not filed, served, submitted for consideration, admitted, or made the subject of an offer of proof, or that the content of a statement or narration is factually inaccurate.
>
> . . . .
>
> If a party requests that an item be included in the record on appeal but not all other parties to the appeal agree to its inclusion, then that item shall not be included in the printed record on appeal, but shall be filed by the appellant with the printed record on appeal in a volume captioned "Rule 11(c) Supplement to the Printed Record on Appeal," along with any verbatim transcripts, narrations of proceedings, documentary exhibits, and other items that are filed pursuant to these rules; *provided that any item not filed, served, submitted for consideration, or admitted, or for which no offer of proof was tendered, shall not be included.*

N.C. R. App. P. 11 (2021) (emphasis added); *see also Hoisington v. ZT-Winston-Salem Assocs.*, 133 N.C. App. 485, 490, 516 S.E.2d 176, 180 (1999) (remarking that, when reviewing a trial court's decision to grant or deny summary judgment, "[w]e may only consider the pleadings and other filings that were before the trial court"), *appeal dismissed*, 351 N.C. 342, 525 S.E.2d 173 (2000).

¶ 13    Here, the trial court conducted its hearing on Defendant's *Motion for Summary Judgment* on 17 August 2020. The Rule 11(c) supplement contains two depositions that were not certified until 20 August 2020, three days later. The trial court

confirmed in its *Amended Order Granting Defendant's Motion for Summary Judgment* that it considered neither of these depositions when evaluating whether to grant Defendant's *Motion for Summary Judgment*. Accordingly, neither deposition informs our review on appeal.

¶ 14        As to the remaining arguments concerning the Rule 11(c) supplement's role in our review, Defendant's contentions concern the *persuasive* relevance of the evidence to our determination, not whether the evidence is properly before us on appeal. As there exist no other indications in the Record or in the parties' arguments that our considering the remainder of the evidence in Plaintiff's Rule 11(c) supplement is improper, it will inform our review insofar as it is relevant.

## B. Defendant's *Motion for Summary Judgment*

¶ 15        Rule 56(c) of our Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56 (2021). "Summary judgment is appropriate when the moving party establishes the lack of any triable issue of fact"; and, in determining whether any such triable issue exists, "[a]ll facts asserted by the nonmoving party are taken as true and viewed in the light most favorable to that party." *Wells Fargo Bank, N.A. v. Stocks*, 378 N.C. 342, 2021-NCSC-90, ¶ 13 (marks and citations

omitted).

Despite its frequent invocation, "[s]ummary judgment 'is an extreme remedy and should be awarded only where the truth is quite clear.'" *Willis v. Town of Beaufort*, 143 N.C. App. 106, 108, 544 S.E.2d 600, 603 (quoting *Lee v. Shor,* 10 N.C. App. 231, 233, 178 S.E.2d 101, 103 (1970)), *disc. rev. denied*, 354 N.C. 371, 555 S.E.2d 280 (2001). It should only be granted in cases where a court is confident that "no person shall be deprived of a trial on a genuine disputed factual issue." *DeWitt v. Eveready Battery Co.,* 355 N.C. 672, 682, 565 S.E.2d 140, 146 (2002) (citations omitted). "[T]he fundamental purpose of a summary judgment motion . . . is to allow a litigant to 'test' the extent to which the allegations in which a particular claim has been couched have adequate evidentiary support." *Prouse v. Bituminous Cas. Corp.*, 222 N.C. App. 111, 116, 730 S.E.2d 239, 242-43 (2012). Accordingly, courts may grant a motion for summary judgment only in those instances where a party

> meets the burden (1) of proving an essential element of the opposing party's claim is nonexistent, or (2) of showing through discovery that the opposing party cannot produce evidence to support an essential element of his or her claim.

*Lowe v. Bradford,* 305 N.C. 366, 369, 289 S.E.2d 363, 366 (1982) (citations and internal quotation marks omitted). "Our standard of review of an appeal from summary judgment is de novo[.]" *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008).

Here, Plaintiff's complaint alleged both alienation of affection and criminal conversation. We address both in turn.

In order to establish a claim for alienation of affection, a plaintiff must show that "(1) there was a marriage with love and affection existing between the [plaintiff] and [his or her spouse]; (2) that love and affection was alienated; and (3) the malicious acts of the defendant produced the loss of that love and affection." *Nunn v. Allen*, 154 N.C. App. 523, 533, 574 S.E.2d 35, 41-42 (2002) (marks and citations omitted), *disc. rev. denied*, 356 N.C. 675, 577 S.E.2d 630 (2003). As there is no meaningful contention that evidence sufficient to survive a motion for summary judgment did not exist with respect to the first two elements,[2] we devote the bulk of our analysis to

---

[2] At minimum, Plaintiff met his burden of production with respect to the first two elements through his verified complaint:

> 4. Prior to [18 January 2016], Plaintiff and [Alison] had a good and loving marriage. Plaintiff was a dutiful spouse and provided a comfortable home and environment for his wife.
>
> . . . .
>
> 14. . . . [T]he genuine love and affection that existed between [] Plaintiff and [Alison] was lost and destroyed . . . .

This verified complaint qualifies as an affidavit for production purposes. *See Page v. Sloan,* 281 N.C. 697, 705, 190 S.E.2d 189, 194 (1972) (citations omitted) ("A verified complaint may be treated as an affidavit if it (1) is made on personal knowledge, (2) sets forth such facts as would be admissible in evidence, and (3) shows affirmatively that the affiant is competent to testify to the matters stated therein.").

whether "the malicious acts of [] [D]efendant produced the loss of that love and affection." *Id.* at 533, 574 S.E.2d at 42.

As to the third element of alienation of affection, "[a] malicious act has been loosely defined to include any intentional conduct that would probably affect the marital relationship." *Rodriguez v. Lemus*, 257 N.C. App. 493, 495, 810 S.E.2d 1, 3 (citations omitted), *disc. rev. denied*, 371 N.C. 447, 817 S.E.2d 201 (2018). However, the exact definitional contours of a "malicious act" are irrelevant for purposes of this appeal[3] because "[m]alice is conclusively presumed by a showing that the defendant engaged in sexual intercourse with the plaintiff's spouse." *Id.* at 495-96, 810 S.E.2d at 3. As the evidence supporting the first element of alienation of affection in this case consists, in primary part, of a series of text messages indicating Alison engaged in sexual intercourse with "Bestie," an admission by Alison that she engaged in sexual acts with "Bestie" and that "Bestie" was a man named "Dustin," and a separate admission by Alison indicating she had engaged in sexual intercourse with an unnamed person, whether the behavior at issue qualified as a "malicious act" would be conclusively presumed in the affirmative, provided sufficient evidence exists that

---

[3] Setting aside evidence concerning extramarital sex acts, Plaintiff's proffered evidence of Defendant's pre-separation acts consisted entirely of phone and Facebook contact, the specifics of which are unknown. Whatever subjective insecurity this behavior may have induced in Plaintiff, we do not believe evidence of this type of contact, without more, "would probably affect the marital relationship" so as to be relevant to our alienation of affection analysis. *Id.*

any paramour referenced was actually Defendant.

¶ 20      As Plaintiff testified during his deposition, he relied primarily on "put[ting] two and two together" in support of his contention that one or more of the parties sexually involved with Alison prior to their separation was actually Defendant. Evidence supporting this identification includes phone and Facebook contact between Alison and Defendant during her and Plaintiff's marriage, the existence of their friendship at work, and the fact that they openly had a romantic and sexual relationship less than four months from the separation date of Alison and Plaintiff's more than decade-long marriage. Plaintiff argues this evidence is sufficient to have survived Defendant's *Motion to Dismiss*; however, Defendant argues this evidence is insufficient for a jury to find that he engaged in sexual intercourse with Alison prior to their separation.

¶ 21      At the heart of the parties' arguments lies a disagreement about the proper role of evidence concerning post-separation conduct with respect to alienation of affection claims; and, more specifically, the scope of our recent holding in *Rodriguez v. Lemus*. In *Rodriguez*, we held that, in cases involving alienation of affection, "evidence of post-separation conduct may be used to corroborate evidence of pre-separation conduct and can support claims for alienation of affection and criminal conversation, so long as the evidence of pre-separation conduct is sufficient to give rise to more than mere conjecture." *Id.* at 498, 810 S.E.2d at 5. In that case, which

involved a challenge to the sufficiency of the evidence to support a trial court's

findings of fact during a bench trial,[4] *id.* at 495, 810 S.E.2d at 3, we held the evidence

was sufficient to support the trial court's findings where

> [the] [p]laintiff's evidence of pre-separation conduct
> included[] (1) phone records showing 120 contacts between
> [the] [d]efendant and [the] [p]laintiff's spouse in a one-
> month period, all at times when [the plaintiff's spouse] was
> away from home; (2) two hotel charges on [the spouse's]
> credit card bill; (3) a third hotel receipt dated 21 March
> 2012 and information from the third hotel that [the spouse]
> was there with a woman; and (4) social media postings by
> [the] [d]efendant and [the plaintiff's spouse] which [the]
> [p]laintiff interpreted as their initials used as a code
> between them.

*Id.* at 498, 810 S.E.2d at 5. Plaintiff argues that, under *Rodriguez*, Defendant's

established, post-separation sexual relationship with Alison properly demonstrates

---

[4] While we are mindful of the discrepancy in scrutiny between our review of a trial court's grant or denial of summary judgment—which is subject to de novo review—and our review of a trial court's findings of fact on appeal from a bench trial—which we review for competent evidence on the record—the two are, for purposes of our analysis, functionally interchangeable in this case. *See id.* at 495, 810 S.E.2d at 3 (citations omitted) ("[W]e are strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence . . . ."); *Jones*, 362 N.C. at 573, 669 S.E.2d at 576 ("Our standard of review of an appeal from summary judgment is de novo[.]"). The nature of our review of a trial court's grant or denial of summary judgment, though de novo, requires us to view the nonmovant's evidence "in the light most favorable to that party," examining only whether they have support on the record. *Stocks*, 378 N.C. 342, 2021-NCSC-90, ¶ 13 (marks and citations omitted). Where, as in *Rodriguez*, the trial court finds a plaintiff's evidence persuasive during a bench trial, our review for competent evidence on the record is nearly identical to our review of whether a plaintiff met her burden of production for purposes of summary judgment. Accordingly, our analysis in *Rodriguez* directly informs our analysis in this case despite the nominal differences in procedural posture.

Defendant was involved in the sexual encounters referenced in Alison's messages and confessions. Meanwhile, Defendant argues that the pre-separation conduct amounts to "mere conjecture," rendering Defendant's post-separation conduct irrelevant for purposes of whether Plaintiff's evidence was sufficient to withstand a motion for summary judgment. *Id.*

Defendant's argument implicitly—and incorrectly—narrows the scope of our holding in *Rodriguez.* The *Rodriguez* principle was articulated in response to the question of whether factfinders could consider evidence of post-separation *at all* after our General Assembly enacted N.C.G.S. § 52-13, which provides that "[n]o act of [a] defendant shall give rise to a cause of action for alienation of affection or criminal conversation that occurs after the plaintiff and the plaintiff's spouse physically separate with the intent of either the plaintiff or plaintiff's spouse that the physical separation remain permanent." N.C.G.S. § 52-13(a) (2021); *see also id.* at 497, 810 S.E.2d at 4 ("[C]laims of alienation of affection and criminal conversation arising after the effective date of [N.C.G.S. §] 52-13 cannot be sustained without evidence of pre-separation acts satisfying the elements of these respective torts. What is less clear is whether evidence of post-separation acts is admissible to support an inference of pre-separation acts constituting alienation of affection or criminal conversation."). In other words, N.C.G.S. § 52-13 prevents defendants in cases involving criminal conversation and alienation of affection from being held liable for acts taking place

after two spouses have separated, and *Rodriguez* effectuates that policy by ensuring that, if a factfinder considers evidence of post-separation conduct, it does so only insofar as it contextualizes pre-separation conduct.

Defendant, in arguing post-separation conduct cannot inform whether Plaintiff's evidence was sufficient to withstand his *Motion for Summary Judgment*, implies that, under *Rodriguez*, corroborating evidence is only available when Defendant has already been identified as the actor in one or more independently sufficient instances of pre-separation conduct. No such limitation exists. Plaintiff presented evidence that his ex-wife engaged in sexual intercourse with at least one third party. To hold that Defendant's post-separation conduct with Plaintiff's ex-wife cannot inform the sufficiency of Plaintiff's evidence insofar as it indicates Defendant may have been "Bestie"—or, if a different person, the man she referenced in the second conversation—would ignore the reality that direct, contemporaneous evidence of adultery is almost never available. *See In re Est. of Trogdon*, 330 N.C. 143, 148, 409 S.E.2d 897, 900 (1991) ("Adultery is nearly always proved by circumstantial evidence."). Accordingly, to the extent Plaintiff's evidence of Defendant's post-separation conduct informs our understanding of the identities of "Bestie," "Dustin," or another professed paramour, it properly informs our review of the trial court's *Amended Order Granting Defendant's Motion for Summary Judgment*.

Having clarified the scope of *Rodriguez*, we must now determine whether

Plaintiff presented evidence which, when taken as true and viewed in the light most favorable to him, could demonstrate that "the malicious acts of [] [D]efendant produced [a] loss of [] love and affection." *Nunn*, 154 N.C. App. at 533, 574 S.E.2d at 42; *Stocks*, 378 N.C. 342, 2021-NCSC-90, ¶ 13. We hold that he did. The evidence of a friendship and frequent contact between Alison and Defendant that existed prior to the relationship, as well as their romantic and sexual relationship after separation, while not sufficient for a jury to conclude the final element of alienation of affection had been met on its own, could convince a jury that Defendant was "Bestie"—or, if different, the person with whom she admitted she had engaged in sexual intercourse. Accordingly, the trial court erred in granting Defendant's *Motion for Summary Judgment* with respect to Plaintiff's claim for alienation of affection.

¶ 25          Likewise, Plaintiff's evidence, when taken as true and viewed in the light most favorable to him, *Stocks*, 378 N.C. 342, 2021-NCSC-90, ¶ 13, demonstrates that Defendant was liable for criminal conversation. "To withstand [a] defendant's motion for summary judgment on [a] claim of criminal conversation, [a] plaintiff must present evidence demonstrating: '(1) marriage between the spouses and (2) sexual intercourse between [the] defendant and [the] plaintiff's spouse during the marriage.'" *Coachman v. Gould*, 122 N.C. App. 443, 446, 470 S.E.2d 560, 563 (1996) (quoting *Chappell v. Redding,* 67 N.C. App. 397, 401, 313 S.E.2d 239, 241, *disc. rev. denied,* 311 N.C. 399, 319 S.E.2d 268 (1984)). Here, as in the alienation of affection

claim, there is no meaningful dispute as to whether Plaintiff and Alison were married; and, also as in the alienation of affection claim, Alison's admission that she had engaged in sexual intercourse with a third party, together with her friendship, contacts, and future romantic and sexual relationship with Defendant, would allow a jury to find Defendant had engaged in sexual intercourse with Alison prior to her and Plaintiff's separation.[5]

¶ 26        Accordingly, the trial court also erred in granting Defendant's *Motion for Summary Judgment* with respect to Plaintiff's claim for criminal conversation.

## **CONCLUSION**

¶ 27        In alienation of affection and criminal conversation cases, a plaintiff's evidence of a defendant's conduct occurring after a plaintiff and his or her ex-spouse separate constitutes viable corroborative evidence for purposes of satisfying the burden of production where the identity of a pre-separation extramarital sexual partner is unknown. Accordingly, here, the trial court erred in granting Defendant's *Motion for Summary Judgment*.

        REVERSED AND REMANDED.

---

[5] We note that the separation restriction in N.C.G.S. § 52-13 also applies to criminal conversation. *See* N.C.G.S. § 52-13(a) (2021) (emphasis added) ("No act of [a] defendant shall give rise to a cause of action for alienation of affection *or criminal conversation* that occurs after the plaintiff and the plaintiff's spouse physically separate with the intent of either the plaintiff or plaintiff's spouse that the physical separation remain permanent.").

Judge DILLON concurs with a separate opinion.

Judge JACKSON dissents with a separate opinion.

DILLON, Judge, concurring.

I fully concur in the majority opinion. Plaintiff David Beavers forecasted sufficient evidence to survive summary judgment on his claims against Defendant for alienation of affection and criminal conversation, so called "heartbalm" torts. Admittedly, there was no *direct* evidence before the trial court that David's wife, Alison, and Defendant were engaging in an affair involving sexual intercourse prior to David and Alison's separation. However, there was evidence that, shortly before their separation, Alison admitted to her husband having an affair with a married co-worker, though she would not identify who the co-worker was. And the *circumstantial* evidence forecasted by David, <u>when viewed in the light most favorable to him</u>, was sufficient for a jury to infer that Allison's affair Alison was with Defendant. This circumstantial evidence showed the following occurred during the year leading up to David and Alison's separation:

As of January 2016, eleven months before they separated, David and Alison had been happily married for much of their eleven years together. Three children were born to the marriage. But that month, David discovered that Alison had sent sexually charged messages and seductive selfies to a married co-worker she refused to identify. Defendant and Alison were co-workers. During 2016, Alison spent some nights and weekends away from David, often being cryptic about where she was going or whom she was with. Defendant admitted going on overnight business trips in

2016. Defendant met with Alison multiple times outside of work prior to Alison and David's separation. In July 2016, David found a receipt from a hotel where Alison had stayed. Defendant and Alison spoke on the phone on one occasion in July 2016 late at night, just prior to midnight. During a week in October 2016, a few months before David and Alison separated, Defendant and Alison exchanged 98 text messages. David and Alison separated in December 2016; Defendant and his wife separated shortly thereafter. By April 2017, Defendant and Alison were openly dating and had sexual intercourse before David and Alison's divorce became final.

¶ 30    As judges, we should not allow our general opinions about heartbalm torts to interfere with our duty to fairly evaluate evidence when determining whether a plaintiff is entitled to have her claims involving these torts heard by a jury.

¶ 31    I write separately to address our dissenting colleague's concern (and the concern in some circles identified in his dissenting opinion) that North Carolina still recognizes claims for alienation of affection and criminal conversation.

¶ 32    Many argue that North Carolina should abolish heartbalm torts because of its misogynistic origins. Indeed, the right to seek damages from a third party who interferes with a marital relationship was originally only available to married men. This right was not available to married women, as a wife was considered in a way the property of her husband. But most rights we all enjoy today used to be enjoyed only

by some. Throughout history, we have responded to these injustices by *extending* these rights to be enjoyed by more groups, not by eliminating them.

¶ 33        For instance, under the common law, a married woman lacked the capacity to enter contracts. *Sanderlin v. Sanderlin*, 122 N.C. 1, 2, 29 S.E. 55, 55 (1898) ("At common law the contract of a married woman was void."). However, recognizing the right to contract is a good thing, rather than doing away with this right altogether, the right to contract has been extended to almost all, including married women.

¶ 34        Also, under the common law, married women had very limited property rights. *See Bass v. Paquin*, 140 N.C. 83, 87, 52 S.E. 410, 412 (1905) ("Prior to 1848, we find no [North Carolina] statute interfering with or limiting the common law right and power of the husband over his wife's property."). However, recognizing the right to own/control property to be a good thing, rather than eliminating this right altogether, property rights have been extended to married women.

¶ 35        "The right to vote is one of the most cherished rights in our system of government[.]" *Blankenship v. Bartlett*, 363 N.C. 518, 522, 681 S.E.2d 759, 762 (2009). It used to be that most people, including married women, could not vote. Again, recognizing the right to vote is a good thing, rather than further restricting voting rights, the right to vote has been extended to most citizens, including married women.

¶ 36        Our Supreme Court recognizes the "tangible and intangible benefits resulting from the loving bond of the marital relationship." *Nicholson v. Hugh Chatham*, 300

N.C. 295, 302, 266 S.E.2d 818, 822 (1980). Indeed, the United States Supreme Court recognizes that "marriage is 'one of the vital personal rights essential to the orderly pursuit of happiness by free [people].'" *Obergefell v. Hodges*, 576 U.S. 644, 664 (2015) (quoting *Loving v. Virginia*, 388 U.S. 1, 12 (1967)).

¶ 37        Recognizing the benefits one receives from a good marriage relationship, our Supreme Court has stated that the basis of an alienation of affection action "is the [plaintiff's] loss of the society, affection, and assistance of [the plaintiff's spouse]." *Ross v. Dean*, 192 N.C. 556, 135 S.E. 348, 349 (1926) (suit by husband). As was done in other jurisdictions, North Carolina extended the right to sue for this law to married women. *See Brown v. Brown*, 121 N.C. 8, 27 S.E. 998 (1897) (extending this right to wives to sue for this loss). More recently, some jurisdictions have done an about-face and have abolished the right of individuals to sue for this loss altogether. But there is a strong argument why we should not follow suit, considering the other injuries for which we allow people to seek redress, many involving less harmful conduct and harm to less significant relationships.

¶ 38        For instance, we already allow a plaintiff to recover for the loss of "society, affection, and companionship" of his/her spouse when that loss is caused by the mere *negligence* of a third party, whose negligence act results in the death or severe injury to the plaintiff's spouse. *Nicholson*, 300 N.C. at 302, 266 S,E,2d at 822 (recognizing claim for "loss of consortium"). Interestingly, under our common law, only a husband

could sue for loss of consortium, as his wife "was regarded as little more than a chattel in the eyes of the law." *Id*, at 298, 266 S.E.2d at 820. But rather than eliminating the right to seek a loss of consortium claim based on this history, we now recognize the loss suffered by a married woman when she loses the benefits of her marriage due to the negligence of a third party is equally compensable. *Id.* at 297, 266 S.E.2d at 819 ("[T]he essence of consortium today has become a mutual right of a husband and wife to the society, companionship, comfort and affection of one another.").

¶ 39         I am not aware of any move to abolish loss of consortium claims. How much more should a married person be able to recover for this same loss (society, affection, companionship) when caused by the wrongful/malicious acts of a third party?

¶ 40         Further, I note that we recognize torts against third parties who wrongfully/maliciously interfere relationships which most would consider less significant than a marriage relationship.

¶ 41         For instance, if I enter a *contractual* relationship with someone to buy her car and if a third party convinces the seller to breach her contract with me, our law recognizes my right to recover any resulting damage. I have the right to sue that third party for interfering with my contractual relationship. *See Beverage Sys. v. Associated Bev.*, 368 N.C. 693, 784 S.E.2d 457 (2016) (recognizing "tortious interference with contract" claim).

¶ 42 Even if I only have a *potential* contractual relationship to buy the car, our law recognizes that I have suffered compensable damages when a third party acts out of malice in talking the seller out of entering a contract with me. *See Owens v. Pepsi Cola*, 330 N.C. 666, 412 S.E.2d 636 (1992) (recognizing claim for "tortious interference with prospective economic advantage").

¶ 43 In a non-commercial setting, our law allows me to sue a third party who acts out of malice to prevent another from creating a valid will which would have included me as a beneficiary. *See Bohannon v. Wachovia*, 210 N.C. 679, 188 S.E. 390 (1936) (recognizing claim for "tortious interference with an expected inheritance").

¶ 44 These torts have long been recognized, and I am not aware of any movement to take away the right to seek damages for these civil wrongs. How much more should we continue to recognize the right of individuals to seek damages from those who out of malice interfere with one of the most important relationships in society?

¶ 45 I acknowledge that there is a concern in retaining heartbalm torts based on the occasional large jury verdict. But we value the role of juries in our society to use their judgment to evaluate the value of compensable harm, within legal parameters. If the size of jury awards is perceived as a problem, the better answer may be a type of tort reform to hold down "runaway" verdicts, rather than abolishing the right for married persons to seek damages at all for the tremendous harm done to them and their families by third parties acting wrongfully/maliciously.

¶ 46        The harm caused by criminal conversation – which merely requires a showing that a third party committed adultery with the plaintiff's spouse, without any requirement to show that the adultery caused the affections of the cheating spouse to be alienated – causes a different harm. Unlike with alienation of affection, a third party can be held liable for criminal conversation even where the cheating spouse instigated the contact.

¶ 47        However, most married persons have an expectation of fidelity within the marriage. *Malecek v. Williams*, 255 N.C. App. 300, 304, 804 S.E.2d 592, 596 (2017) (analyzing the constitutionality of North Carolina's heartbalm torts). And a plaintiff suffers harm when this expectation is not realized. It may be that a cheating spouse and third party should not be held *criminally* liable for adultery. Indeed, such prosecutions are essentially non-existent, and many courts have held such criminal laws to be unconstitutional. However, just because one should not be held criminally responsible does not necessarily mean that *civil* liability cannot be imposed, as with other torts that do not involve criminal conduct. Cheating spouses already suffer from a civil standpoint for their adulterous behavior: a cheating spouse who is a supporting spouse is liable for alimony; and a cheating spouse who is a dependent spouse loses any right to receive alimony. N.C. Gen. Stat. § 50-16.3(a).

¶ 48        "No union is more profound than marriage, for it embodies the highest ideals of love, fidelity, devotion, sacrifice, and family. In forming a marital union, two people

become something greater than once they were." *Obergefell*, 576 U.S. at 681. Under our common law, the right to seek redress from a jury of his peers for the loss of the benefits of this most profound of relationships used to reside solely with men. But, as with other rights, our State has progressed by extending this right to women. I see no reason why we should regress.

JACKSON, Judge, dissenting.

¶ 49    I would hold summary judgment for Defendant was proper in that Plaintiff had utterly failed to produce one single genuine issue of material fact as to the identity of his wife's paramour and would therefore affirm the order of the trial court. Additionally, on a more fundamental level, the torts of alienation of affection and criminal conversation have been outdated for over a hundred years and it is past time that these torts be abolished. I wish to take this opportunity to explain in detail why.

¶ 50    For all the reasons below, I respectfully dissent.

### I.    The Torts of Alienation of Affection and Criminal Conversation Should be Abolished

¶ 51    In the latter half of the 19th century, every state in the nation, apart from Louisiana, recognized a husband's right of action to bring alienation of affection and criminal conversation claims. William R. Corbett, *A Somewhat Modest Proposal to Prevent Adultery and Save Families: Two Old Torts Looking for A New Career*, 33 Ariz. St. L.J. 985, 1005 (2001) ("Corbett"). By the 1980s, even with the ability of wives to bring the same causes of action due to the passage of Married Women's Property Acts, most states had limited the torts significantly or abolished them entirely. *Id.* at 1009-10. Today, alienation of affection remains a viable tort claim in only four states besides North Carolina—Hawaii, Mississippi, South Dakota, and Utah—and

criminal conversation in only three other states—Hawaii, Kansas, and Maine. [6] *See* H. Hunter Bruton, Note, *The Questionable Constitutionality of Curtailing Cuckolding: Alienation-of-Affection and Criminal-Conversation Torts*, 65 Duke L.J. 755, 760-61 (2016).

¶ 52    Despite the overwhelming disfavor of these claims nationally, these torts are alive and well in North Carolina, regrettably in my view.  Practitioners estimate approximately 200 alienation of affection lawsuits are filed each year.  Meghann Mollerus, *Alienation of Affection:  Yes, You Can Sue Your Marriage's Homewrecker*, WFMY News 2 (Feb. 12, 2019, 9:28 AM) https://www.wfmynews2.com/article/home/ alienation-of-affection-yes-you-can-sue-your-marriage-homewrecker/83-1b416ffc-4665-4763-82d6-bb73c40c32d4.  Furthermore, over the past two decades the damages awards have become enormous.  Amongst the notable verdicts between 1998 and 2018 were seven jury awards of $1 million or more, including a $9 million award in 2010, four jury awards between $100,000 and $750,000, and three bench awards between $5 million and $30 million.  G. Edgar Parker, *Tort Claims for Alienation of Affections and Criminal Conversation are Alive and Well in North Carolina*, N.C. State Bar J., Summer 2019, at 20-21.  These torts continue to be used despite repeated legislative

---

[6] Although it has not been expressly abolished in New Mexico, the New Mexico Supreme Court disfavors claims for alienation of affection and even stated as long ago as 1978 that the tort goes against the best interest of the people and should be abolished. *Thompson v. Chapman*, 93 N.M. 356, 358, 600 P.2d 302, 304 (1978).

attempts to abolish them. Jean M. Cary & Sharon Scudder, *Breaking Up Is Hard To Do: North Carolina Refuses to End Its Relationship with Heart Balm Torts*, 4 Elon L. Rev. 1, 16-19 (2012) ("Cary & Scudder").

¶ 53      Additionally, prominent stakeholders in the North Carolina legal community have long called for the end of the so-called heart balm torts. In 1998—almost twenty-five years ago—the North Carolina Association of Women Attorneys adopted a resolution calling for the elimination of the torts. The resolution's recitals typify the reasons the torts should be abolished:

> WHEREAS the origin of the torts, alienation of affection and criminal conversation is the anachronistic philosophy that women were property; and
>
> WHEREAS this philosophy is inconsistent with the sound principle that women are full and equal partners in marriage; and
>
> WHEREAS these torts are inconsistent with North Carolina's public policy embodied in its laws of no fault divorce; and
>
> WHEREAS, the litigation of these torts contributes to the conflict between marital partners and has a detrimental impact on the family.

*Annual Meeting Resolutions*, North Carolina Association of Women Attorneys, https://www.ncawa.org/assets/docs/ncawa-annual-meeting-resolutions-through-2018.pdf (last accessed 20 July 2022). In the early 2000s, the Family Law Section of the North Carolina Bar Association began actively advocating for the legislative

repeal of the torts. Cary & Scudder*, supra* at 16.

¶ 54 Our Court even judicially abolished the torts in 1984, *Cannon v. Miller*, 71 N.C App. 460, 497, 322 S.E.2d 780, 804 (1984), only to have the decision vacated just two months later by our Supreme Court in a four-sentence order, 313 N.C. 324, 327 S.E.2d 888 (1985). There was no analysis in the Supreme Court's order. All the reasons for abolishing the torts articulated by our Court in *Cannon* remain true today and *many* of these reasons have only become *more* compelling over the last 36 years. Our Supreme Court deserves another opportunity to correct this wrong.

**A. The Concept of Women as Property Inherent in the Claims of Alienation of Affection and Criminal Conversation Is Wrong, and Inconsistent with Modern Law**

¶ 55 Alienation of affection and criminal conversation are common law torts rooted in the antiquated idea that women, when married, are the personal property of their husbands. Legal recognition and validation of these rights gave husbands "an action against a third party when that person abducted her, seduced her, beat her, or 'stole' her affections"—in other words, a lawsuit for stealing a woman from a man that through marriage the law regarded the man to own, as though the woman were livestock or worse. 1 Suzanne Reynolds, *Reynolds on North Carolina Family Law* § 3.12 (6th ed. 2020) ("Reynolds"); *see also Barbee v. Armstead*, 32 N.C. (10 Ired.) 530 (1849). This action, in its early incarnation known as a suit for enticement, allowed a husband to recover for the loss of his wife's services from a third person who had

enticed or separated the wife away from the husband, regardless of whether the wife had herself *consented* to leave. *See* Reynolds, *supra* § 3.12; *Cannon v. Miller*, 71 N.C. App. at 471, 322 S.E.2d at 789. While enticement as such is no longer recognized in North Carolina, or any other state, the iniquitous spirit of the tort is alive and flourishing in the claims of alienation of affection and criminal conversation still recognized today in North Carolina. Reynolds, *supra*, § 3.12; *see also* Jennifer E. McDougal, Comment, *Legislating Morality: The Actions for Alienation of Affections and Criminal Conversation in North Carolina*, 33 Wake Forest L. Rev. 163, 164 (1998) ("McDougal").

¶ 56          It has been said that "[t]he gravamen of the . . . cause of action [for alienation of affection] is the deprivation of the husband of his conjugal right to the society, affection, and assistance of his wife[.]" *Cottle v. Johnson*, 179 N.C. 426, 428, 102 S.E 769, 770 (1920). In other words, "the action seeks recompense for the loss of consortium[.]" Reynolds, *supra*, § 3.13. Between spouses, "consortium" is a legal euphemism for sex. *Consortium*, Black's Law Dictionary (11th ed. 2019). The right of a husband to recover for the loss of consortium from his wife was based on the shameful legal recognition and validation of the wife as chattel owned by the husband. *Cannon*, 71 N.C. App. at 473, 322 S.E.2d at 790. If a third party interfered with the service of a man's chattel, such as a servant or a slave, that man had an action for trespass. *Id.* Applying this concept to the marital relationship, if a third

party interfered with a wife providing her services—her society, companionship, and sexual relations—to her husband, then the husband had a cause of action. *Id.* In terms that unfortunately were characteristically common at the time, the North Carolina Supreme Court described this reality in a 1921 opinion, explaining:

> At common law the husband could maintain an action for the injuries sustained by his wife for the same reason that he could maintain an account for injuries to his horse, his slave, or any other property; that is to say, by reason of the fact that the wife was his chattel. This was usually presented in the euphemism that "by reason of the unity of marriage" such actions could be maintained by the husband.

*Hipp v. E.I. Dupont De Nemours & Co.*, 182 N.C. 9, 12, 108 S.E. 318, 319 (1921), *overruled by Hinnant v. Tide Water Power Co.*, 189 N.C. 120, 126 S.E. 307 (1925).

¶ 57      Prior to the enactment of Married Women's Property Acts, only husbands had a property interest in their wives and therefore only a husband could recover for the loss of consortium. McDougal*, supra*, at 165. In *Hipp*, our Supreme Court frankly noted the reason that a woman had no corresponding property interest in a man to whom she was married by referencing Blackstone's Commentaries:

> We may observe that in these relative injuries notice is only taken of the wrong done to the superior of the parties (husband) injured by the breach and dissolution of either the relation itself, or at least the advantages accruing therefrom; while the loss of the inferior (the wife) by such injuries is totally unregarded. One reason for this may be this: *That the inferior hath no kind of property in the company, care or assistance of the superior is held to have*

> *in those of the inferior; and therefore the inferior can suffer no loss or injury.*

182 N.C. at 13, 108 S.E. at 319 (quoting 3 Blackstone's Commentaries, 143) (emphasis added).

¶ 58        By the end of the 1800s, every state had enacted laws known as Married Women's Property Acts that removed some of the legal disabilities of married women and granted them most of the same de jure rights as their husbands—primarily, rights to "acquire, own, and transfer property, make contracts, be employed and keep their earnings, sue, and be sued." McDougal, *supra*, at 165 n.13. As the inferior party was now at least nominally on somewhat more equal footing with the so-called superior party, the North Carolina Supreme Court decided in 1897 that women could also bring an action for alienation of affection against their husbands, *see Brown v. Brown*, 121 N.C. 8, 27 S.E. 998 (1897), and by 1925 went as far as to hold that the same was true for the tort of criminal conversation, *see Hinnant*, 189 N.C. at 126, 126 S.E. at 309-10.

¶ 59        Today, proponents of the torts often argue that the archaic origins of the torts do not matter and the fact that women today enjoy the right to assert claims on an equal basis with men, along with other rationales—such as disincentivizing adultery and promoting the stability of the nuclear family for the purpose of childrearing— justify the continued existence of the torts. *See* Lance McMillan, *Adultery as Tort*, 90

N. C. L. Rev. 1987, 1999 (2012) ("McMillan"); Corbett, *supra* at 1015. Yet the ability of both husbands and wives to bring an action for alienation of affection and criminal conversation does not resolve, abrogate, or otherwise eliminate the offensive and outdated concept underpinning the torts—that through marriage, a spouse becomes the property of the other spouse.

¶ 60          A person cannot be the property of another person. A wife is not property, and a husband is not property. For the most part, the law stopped recognizing and validating this concept over 100 years ago. That it has not stopped doing so in North Carolina in 2022 through the continued recognition of the validity of the torts of alienation of affection and criminal conversation is shameful and a wrong that we should right today. If spouses are not property of one another, they cannot be stolen— nor can their love or affection be stolen. *See* McDougal, *supra* at 181-83. The law must not validate the idea that sex is something a person can owe another person— and by extension, something that a third person could possibly steal—regardless of whether the two people have been joined in the legal union we know as marriage. "[T]he promise of sexual fidelity is simply not a possession that can be taken away by a third party without the permission of the participating spouse." Cary & Scudder, *supra* at 14. As the Washington Court of Appeals summarized when abolishing criminal conversation: "The love and affection of a human being who is devoted to another human being is not susceptible to theft. There are simply too many

intangibles which defy the concept that love is property." *Irwin v. Coluccio*, 32 Wash. App. 510, 515, 648 P.2d 458, 461 (1982). Love is not property.

¶ 61        By extension, if a person is not the property of another person—nor is their love or their affection—then that person cannot be compensated for the loss of this property because it was not property in the first place. In abolishing alienation of affection in 1981, the Supreme Court of Iowa explained: "We certainly do not do so because of any changing views on promiscuous sexual conduct. It is merely and simply because the plaintiffs in such suits do not deserve to recover for the loss of or injury to 'property' which they do not, and cannot, own." *Fundermann v. Mickelson*, 304 N.W.2d 790, 794 (Iowa 1981). The same should be true in North Carolina.

¶ 62        Furthermore, any suggestion that the concept that women are the property of their husbands is not, or is no longer, the basis for the torts of alienation of affections and criminal conversation is false, or worse—dishonest. Our Court explained as much almost 40 years ago in *Cannon v. Miller*: "The[se] [] actions have never fully shaken free from their property-based origins, as evidenced by fact that the consent of the participating spouse to the offending conduct, or even his or her initiation of it, will not bar the suit." 71 N.C. App. at 492, 322 S.E.2d at 801. In other words, the lack of consent as a defense means the law treats spouses as property that can be taken from one another rather than as fully autonomous and equal moral persons who can make their own voluntary choices, including the choice to engage in an

extramarital relationship with a third person—whether or not the relationship is sexual.

¶ 63    Participation in extramarital relationships, sexual or not, may be wrong, and society may rightly disapprove of such behavior; however, disincentivizing people from choosing to engage in these relationships by treating a person as the property of another person is wrong and has no place in our world or society today.  The Married Women Property Acts were supposed to dispose of the legal treatment of women as the property of men they had married—and of course, the law has *never* regarded husbands as the personal property of their wives.  The fact that the consent of a spouse remains unavailable to a third party to the marriage as a defense to a claim belies any argument that the torts are not or are no longer fundamentally sexist, wrong, and based on the concept that women are the property of men they marry.  *See* 1 Lloyd T. Kelso, *North Carolina Family Law Practice* § 5.9 (2022).

¶ 64    The fact these torts inherently treat people and their love, affection, and society as *property* makes them fundamentally different than torts that allow for the compensation of interference in contractual relationships.  A party to a contract can sue a third-party for tortious interference with the contract because the party has *contractual* rights to the subject of the contract, *not inherent property rights* to the subject of the contract.  "[P]roperty is about a person's right to a thing, and contract is about promises to transfer those rights from one person to another."  Blake

Rohrbacher, Note, *More Equal Than Others: Defending Property-Contract Parity in Bankruptcy*, 114 Yale L.J. 1099, 1103 (2005). To justify the existence of the heartbalm torts on the basis that we allow for the compensation of interference in contractual relationships would be to view marriage as a contractual relationship in which spouses confer to one another a property right in themselves and their services. Ultimately, either view of marriage advanced by the justifications of these torts—as two people who are the property of one another or two people who contracted to exchange their companionship and services with one another—undermines the idea of a marriage as a *commitment* between two individuals who freely and joyfully promise to love, cherish, and honor one another till death do them part.

The existence of these torts today is indefensible. As the Missouri Supreme Court observed almost 20 years when it finally judicially abolished the tort of alienation of affection in Missouri, "[w]hen the reason for a rule of law disappears, so to[o] should the rule. . . . The original property concepts justifying the tort are inconsistent with modern law." *Helsel v. Noellsch*, 107 S.W.3d 231, 233 (Mo. 2003) (en banc) (internal citation omitted).

## B. Alienation of Affection and Criminal Conversation Do Not Actually Serve the Purposes Stipulated as Modern Justifications for their Continued Existence

The modern justifications for these heartbalm torts, "providing a remedy for injuries of a highly sensitive nature while discouraging intentional disruptions of

families[,]" McDougal, *supra* at 182 (citation omitted), simply do not remedy the poisonous origins of the torts. This would be true even if alienation of affection and criminal conversation actually "fulfill[ed] their purposes of protecting marriages and the family, compensating the plaintiff for an actual loss, and deterring undesirable behavior." *Id.* at 183 (internal marks omitted). The reality, however, is that the torts fail to serve these purposes, and lack any adequate modern justification for existence.

¶ 67    Proponents of these torts often argue that they act as a deterrent to people contemplating an extramarital affair—that a potential third party will pause and consider the potential financial repercussions before becoming involved with a married person. Corbett, *supra* at 1016-17. The subtext of this argument is that society cannot rely on individual moral decision making and thus a financial disincentive is needed to prevent extramarital affairs. The effectiveness of any such deterrent, however, requires that the existence of the disincentive is common knowledge. If a third party does not know they could be sued for participating in an affair with a married person, then the torts have no deterrent effect whatsoever. And there is not public knowledge of the continued viability of the torts in North Carolina today. *See, e.g.*, Cary & Scudder, *supra* at 21 ("[M]any people in North Carolina do not know that they can be sued for having intercourse with a person who is married, and even if they do know, they may not be aware of the true marital status of the person they are seducing. . . . [P]eople who are not lawyers are often surprised to find

out that spouses can sue the third party for monetary damages as a result of an extramarital affair.") (internal marks omitted). This lack of public awareness continues despite the media attention multi-million-dollar verdicts generate.

¶ 68        Marriages are not preserved by the torts, nor are families protected by them. No credible empirical evidence suggesting otherwise exists. These torts do not dissuade third parties from engaging in an affair with a married person. Between 2019 and 2020, the last period prior to the increased stress of the pandemic for which data is available, North Carolina tied for the 16th highest divorce rate amongst 45 states. *Divorce Rates by State: 2019-2020*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/nchs/pressroom/sosmap/divorce_states/divorce_rates.htm (last accessed 25 July 2022). Amongst the other states where alienation of affection remains a viable cause of action, Mississippi and Utah are tied for the sixth highest divorce rate, and South Dakota is tied for the 22nd highest divorce rate. *Id.*

¶ 69        The ultimate irony of the justification that these torts help preserve marriages or protect families is that the initiation of a lawsuit almost certainly pushes a struggling marriage past the point of reconciliation. McDougal, *supra* at 183. The Court in *Cannon v. Miller* put it thusly: "[G]ranting that the marriage relation is deserving of society's protection, the efficacy of the actions as a 'preservative' has never been documented. Rather, the very institution of the lawsuit would seem likely to destroy any remaining marital harmony through the notoriety of marital failure

and the stresses of litigation." 71 N.C. App. at 492, 322 S.E.2d at 800-01.

¶ 70          Similarly, the existence of these torts likely harms families and their ability to

heal and move forward. Particularly examining the impact of protracted litigation

on children, two authors explained:

> If children are involved in a marriage that ends in the
> shadow of adultery, then protecting the emotional stability
> of the children also provides a strong reason why criminal
> conversation and alienation of affection should be
> abolished.
>
> One author argues that the civil adversarial system in
> family law already greatly increases harm to children who
> are subjected to divorce by encouraging competition and
> power struggles between parents at the expense of the
> child, and that the time for litigation must be limited for
> the benefit of the children.
>
> To minimize the negative impact upon children involved in
> divorce, parents must minimize the involvement of the
> legal system and lengthy litigation following divorce,
> rather than increase the causes of action filed against the
> spouse or an alleged paramour. In working out the details
> of ending a marriage, families are better served by avoiding
> a situation where one spouse is pitted against the other
> because children suffer greater harm when they are
> expected to choose sides between two parents.

Cary & Scudder, *supra* at 25 (footnotes and internal marks omitted). To a certain

extent, forgiveness "is required in order for a betrayed spouse to move forward into

healthy relationships" and such forgiveness can, in part, be obtained by relinquishing

the right or desire to punish the betraying spouse. *Id.* at 24.

Stripped of the proffered modern justifications, the only reasons that remain for the continued existence of the torts is the antiquated and immoral concept that a person can be the property of another person because they are married, which as discussed *infra*, has no place in our world. Continued recognition of the torts is indefensible. They should be abolished by our Court today.

## II.    Analyzing the Case *Sub Judice*

Notwithstanding my belief that alienation of affection and criminal conversation should be abolished by our Court today, I would hold that the trial court did not err in granting Defendant's motion for summary judgment and that the order of the trial court should be affirmed. First, the *Rodriguez v. Lemus*, 257 N.C. App. 493, 810 S.E.2d 1 (2018), opinion upon which Plaintiff relies was wrongly decided. The legislative history of N.C. Gen. Stat. § 52-13(a) demonstrates that the General Assembly intended for it to make an inference by the jury of pre-separation conduct from evidence of post-separation conduct impossible. Second, even applying *Rodriguez*, I would hold that the proffered evidence of post-separation conduct in this case is insufficient to support an inference that it was Defendant who engaged in tortious pre-separation conduct with Plaintiff's wife. Any conclusion to that effect by a jury would be based on nothing more than mere conjecture.

## A. *Rodriguez* Was Wrongly Decided

As the *Rodriguez* Court highlighted, "[i]n 2009, the General Assembly codified

alienation of affection and criminal conversation in a statute specifically limiting these torts to arise only from acts committed prior to a couple's separation[.]" 257 N.C. App. at 496, 810 S.E.2d at 4. The new section added to Chapter 52 of the North Carolina General Statutes provides in relevant part: "No act of the defendant shall give rise to a cause of action for alienation of affection or criminal conversation that occurs after the plaintiff and the plaintiff's spouse physically separate with the intent of either the plaintiff or plaintiff's spouse that the physical separation remain permanent." N.C. Gen. Stat. § 52-13(a) (2021). The Court in *Rodriguez* reasoned that the effect of this section is that claims of alienation of affection and criminal conversation "cannot be sustained without evidence of pre-separation acts satisfying the elements of these respective torts." 257 N.C. App. at 497, 810 S.E.2d at 4.

¶ 74 The Court in *Rodriguez* went on to state that it was "less clear [] whether evidence of post-separation acts is admissible to support an inference of pre-separation acts constituting alienation of affection or criminal conversation." *Id.* This is essentially a question of statutory interpretation since N.C. Gen. Stat. § 52-13 dictates that liability only attaches to pre-separation conduct.

¶ 75 "The principal goal of statutory construction is to accomplish the legislative intent. The intent of the General Assembly may be found first from the plain language of the statute, then from the legislative history, the spirit of the act and what the act seeks to accomplish." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d

513, 517 (2001) (internal marks and citations omitted).

¶ 76        Here, the plain language of N.C. Gen. Stat. § 52-13 does not give a clear and unambiguous answer to the question posited by the *Rodriguez* Court and therefore the next step is to refer to the statute's legislative history. *See e.g.*, *Wells Fargo Bank, N.A. v. Am. Nat'l Bank & Tr. Co.*, 250 N.C. App. 280, 286, 791 S.E.2d 906, 911 (2016) ("When this Court is called upon to interpret a statute, we must examine the text, consult the canons of statutory construction, and consider any relevant legislative history, regardless of whether the parties adequately referenced these sources of statutory construction in their briefs. To do otherwise would permit the parties, through omission in their briefs, to steer our interpretation of the law in violation of the axiomatic rule that while litigants can stipulate to the facts in a case, no party can stipulate to what the law is. That is for the court to decide.")

¶ 77        The relevant legislative history of N.C. Gen. Stat. § 52-13 is as follows:

¶ 78        During the 2009 legislative session, a bill was introduced in the North Carolina House of Representatives to amend Chapter 52 of the General Statutes, by adding a new section delineating procedures in causes of action for alienation of affection and criminal conversation. H.B. 1110, Gen. Assemb., Sess. 2009 (N.C.) (Filed), https://www.ncleg.gov/Sessions/2009/Bills/House/PDF/H1110v0.pdf. After the bill was debated and passed its second reading in the House, an amendment was introduced on the House floor to add the following provision:

> Nothing herein shall prevent a court from considering incidents of post-separation acts by defendant as corroborating evidence supporting other evidence that defendant committed acts during the marriage and prior to the date of separation which would give rise to a cause of action for alienation of affection or criminal conversation.

H.B. 1110, Gen. Assemb., Sess. 2009 (N.C.) (A3), https://webservices.ncleg.gov/ViewBillDocument/2009/827/0/A3.

¶ 79 This proposed amendment was intended to align the treatment of post-separation evidence in alienation of affection and criminal conversation cases with that of the existing statutory treatment of post-separation marital misconduct as a factor in post-separation support and alimony decisions. Indeed, the post-separation support statute provided, as it still does today, the following:

> Nothing herein shall prevent a court from considering incidents of post date-of-separation marital misconduct as *corroborating* evidence supporting *other* evidence that marital misconduct occurred during the marriage and prior to the date of separation.

N.C. Gen. Stat. § 50-16.2A(e) (2009) (emphasis added). The alimony statute included, as it still does today, an identical provision when listing marital misconduct of either spouse as a relevant factor the trial court should consider in determining the amount, duration, and manner of payment of alimony. N.C. Gen. Stat. § 50-16.3A(b)(1) (2009).

¶ 80 Crucially, the proposed amendment failed. Accordingly, the *Rodriguez* holding permitting the use of post-separation conduct evidence to support findings or

inferences of pre-separation misconduct is fundamentally inconsistent with the legislative intent behind N.C. Gen. Stat. § 52-13(a).

¶ 81        I note here that my above analysis does not run afoul of our Supreme Court's guidance regarding the use of legislative intent where there is a failure to act on behalf of the legislature.  In *North Carolina Department of Corrections v. North Carolina Medical Board*, 363 N.C. 189, 675 S.E.2d 641 (2009), our Supreme Court delineated the following:

> First, this Court has previously recognized the rule "that ordinarily the intent of the legislature is indicated by its actions, and not by its failure to act." *Styers v. Phillips,* 277 N.C. 460, 472-73, 178 S.E.2d 583, 589-91 (1971) ("'Courts can find the intent of the legislature only in the acts which are in fact passed, and not in those which are never voted upon in Congress, but which are simply proposed in committee.'" (quoting *United States v. Allen,* 179 F. 13, 19 (8th Cir. 1910), *aff'd as modified on other grounds by Goat v. United States,* 224 U.S. 458 (1912), *and by Deming Inv. Co. v. United States,* 224 U.S. 471 (1912))). That a legislature declined to enact a statute with specific language does not indicate the legislature intended the exact opposite. *Id.* at 472, 178 S.E.2d at 589 (declining "'to attribute any such attitude to the Legislature'" and noting that a party's argument as to why a bill failed to pass "'can be nothing more than conjecture'" and "'[m]any other reasons for legislative inaction readily suggest themselves'" (quoting *Moore v. Bd. of Chosen Freeholders,* 76 N.J. Super. 396, 404, 184 A.2d 748, 752, *modified on other grounds,* 39 N.J. 26, 186 A.2d 676 (1962))).  Finally, "[i]n determining legislative intent, this Court does not look to the record of the internal deliberations of committees of the legislature considering proposed legislation." *Elec. Supply Co. of Durham v. Swain Elec.*

*Co.,* 328 N.C. 651, 657, 403 S.E.2d 291, 295 (1991).

*Id.* at 202, 675 S.E.2d at 650.

¶ 82        Here, the proposed amendment was voted on by the entire North Carolina House of Representatives and the bill was voted on and passed by the General Assembly. This is not the case of a legislature failing to pass a bill or a bill that never left committee. Rather, the North Carolina House of Representatives had the opportunity to permit the use of post-separation evidence to corroborate pre-separation conduct and voted *not* to allow the use of such evidence in civil actions for alienation of affection and criminal conversation. By looking at the failed amendment, I am drawing on legislative history more substantial than the internal deliberations of a committee or, as another example, the testimony by a member of the legislature about a bill that failed to pass, as was the case in *Styers v. Phillips*, 277 N.C. 460, 178 S.E.2d 583, which our Supreme Court cited when outlining the rule that it is actions and not inactions that indicate the intent of the legislature.

¶ 83        Furthermore, a failed amendment to a later-enacted bill is exactly the type of legislative history our Court should draw on when interpreting an ambiguous statute. After all, legislative history is defined both as "[t]he proceedings leading to the enactment of a statute, including hearings, committee reports, and floor debates[,]" *Legislative History*, Black's Law Dictionary (11th ed. 2019), and "the textual, political, and archival record of a statute or bill as it moves from idea to draft to bill, then

through the process of introduction or sponsorship, committee review, debate, amendment, voting, passage to the other chamber for a similar process, reconciliation if needed, executive treatment and, if needed, legislative response[,]" *Legislative History*, The Wolters Kluwer Bouvier Law Dictionary (Desk ed. 2012).

## B. Even Applying *Rodriguez*, I Would Hold That Summary Judgment Was Proper

¶ 84        Ultimately, although *Rodriguez* conflicts with the legislative intent behind N.C. Gen. Stat. § 52-13(a), our Court is bound by its holding per our Supreme Court's directive in *In re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989), that a panel of this Court cannot overrule a previous panel's decision.  However, even applying *Rodriguez* to the case at bar, I would hold that summary judgment was proper and affirm the trial court because Plaintiff did not produce any evidence of pre-separation conduct that evidence of post-separation conduct can properly corroborate to give rise to more than mere conjecture.

### 1. *Alienation of Affection Claim*

¶ 85        "To establish a claim for alienation of affections, plaintiff's evidence must prove: (1) plaintiff and [his wife] were happily married and a genuine love and affection existed between them; (2) the love and affection was alienated and destroyed; and (3) the wrongful and malicious acts of defendant produced the alienation of affections." *Darnell v. Rupplin*, 91 N.C. App. 349, 350, 371 S.E.2d 743,

745 (1988) (internal marks and citation omitted). "The plaintiff does not have to prove that his spouse had no affection for anyone else[,] . . . he only has to prove that his spouse had *some* genuine love and affection for him and that love and affection was lost as a result of defendant's wrongdoing." *Brown v. Hurley*, 124 N.C. App. 377, 380-81, 477 S.E.2d 234, 237 (1996) (emphasis in original). Furthermore, "[o]ne is not liable for merely becoming the object of the affections that are alienated from a spouse. There must be active participation, initiative or encouragement on the part of the defendant in causing one spouse's loss of the other spouse's affections for liability to arise." *Peake v. Shirley*, 109 N.C. App. 591, 594, 427 S.E.2d 885, 887 (1993).

¶ 86        As the majority notes, the issue here is with element three of Plaintiff's alienation of affection claim. Plaintiff has failed to produce any direct evidence *identifying Defendant* as the individual with whom Plaintiff's wife had an extramarital affair and sexual intercourse with prior to Plaintiff and his wife's separation on 16 December 2016. Assuming arguendo that evidence of an affair prior to Plaintiff and his wife separating equates to evidence of wrongful and malicious acts that alienated the affections of Plaintiff's wife, I would hold that the post-separation evidence Plaintiff produced about the relationship between his wife and Defendant that he argues corroborates the pre-separation evidence of marital misconduct gives rise to nothing more than conjecture. Even under *Rodriguez*, this evidence does not

support Plaintiff's claims:

> [E]vidence of post-separation conduct may be used to corroborate evidence of pre-separation conduct and can support claims for alienation of affection and criminal conversation, *so long as the evidence of pre-separation conduct is sufficient to give rise to more than mere conjecture.*

257 N.C. App. at 498, 810 S.E.2d at 5 (emphasis added).

¶ 87 Specifically, I disagree with Plaintiff's argument that the fact his wife and Defendant began a relationship in April 2017 following their separation in December 2016 is sufficient post-separation evidence to conclude that it was in fact *Defendant* who Plaintiff's wife was having an affair with prior to their separation. Plaintiff's argument is nothing more than conjecture.

¶ 88 First, beyond Plaintiff's wife's own admission, there is no contemporaneous, pre-separation evidence of an affair. Instead, Plaintiff alleges that in January 2016 he viewed sexually explicit text messages on his wife's phone being exchanged with a contact labeled "Bestie." These text messages though are not a part of the record and apparently have not been produced in discovery, nor has the *phone number* linked to the "Bestie" contact, or the "Bestie" contact itself. Plaintiff has every incentive in this case to provide this evidence and as yet has not supplied it. Without more, concluding that Defendant was "Bestie" based on the post-separation evidence in the record would be to reach a conclusion based on nothing more than an accusation. The simple

existence of the "Bestie" contact in Plaintiff's wife's phone does not equate to pre-separation evidence of *Defendant* being the individual on the other end of the "Bestie" contact—this pre-separation evidence gives rise to nothing more than mere conjecture.

¶ 89 Second, in January 2016 when Plaintiff's wife admitted to having an affair and sexual intercourse with another individual, Plaintiff's wife offered two possibilities: that the affair was with someone named Dustin or with a co-worker. Plaintiff searched for a "Dustin" within his wife's social media accounts and could find nothing, but Plaintiff did not try and ascertain whether there was a "Dustin" working at Merck Durham, where Plaintiff's wife worked. Plaintiff's wife also told Plaintiff at one point that the co-worker she had an affair with moved to Atlanta, which Plaintiff believed to the point he objected to his wife taking a girls' weekend trip to Atlanta. Plaintiff himself suspected his wife potentially had an affair during their marriage with an individual named Jonathan Hartman because Mr. Hartman's wife sent Plaintiff's wife a message about interfering with the Hartmans's marriage. Therefore, the fact that Plaintiff's wife and Plaintiff himself identified persons other than Defendant as men Plaintiff's wife might have had an affair with indicates in part that Plaintiff's assertion that Defendant was Plaintiff's wife's paramour was no more than mere conjecture.

¶ 90 Third, Plaintiff has alleged several actions by Defendant or his wife as evidence

of pre-separation conduct that could be corroborated by evidence of post-separation conduct to support his claims. There was no evidence properly before the trial court, however, of a number of these actions, specifically that Plaintiff's wife altered her appearance at work, that Plaintiff's wife and Defendant ate lunch together at work, that Defendant gave Plaintiff's wife a gift, and that Defendant joined the same gym as Plaintiff's wife.[7] Defendant did admit to seeing Plaintiff's wife outside of the workplace in 2016 and earlier in his interrogatories, but only during group business lunches and on two or three occasions in the context of birthday or farewell dinners attended by other co-workers.

When considering other evidence that is a part of the record, during his deposition, Plaintiff could not recall how many solo vacations his wife took prior to January 2016, when they occurred, or where she went. Following the admission of an affair, Plaintiff's wife would occasionally stay the night at a female co-worker's house, and Plaintiff admitted that she told him the name of this co-worker. Plaintiff never gathered any information to verify his wife's location before or after the admission of the affair. Furthermore, Plaintiff could not identify any third parties

---

[7] Plaintiff identified these actions from the depositions of Plaintiff's wife and Defendant's wife, which are contained in the Rule 11(c) supplement to the record. Per Part A of the majority's opinion in which I concur, these depositions were not certified until after the summary judgment hearing, were not considered by the trial court in granting Defendant's motion for summary judgment, and therefore neither one informs this Court's review on appeal.

who could provide information about when his wife met with someone to have an affair or who witnessed his wife having inappropriate interactions with other men.

¶ 92        Additionally, in his sworn interrogatories, Defendant stated that his relationship with Plaintiff's wife became romantic on 1 April 2017 after they had a daytime date picking strawberries, they had sex for the first time on 6 April 2017 after dinner at his apartment, which was also the first time Plaintiff's wife stayed overnight at Defendant's apartment, and the first time he stayed at Plaintiff's wife's apartment was in late summer or fall of 2017.

¶ 93        Altogether, the discovery that Plaintiff gathered included: (1) Defendant's phone records from September 2015 to February 2017 supplied by Verizon Wireless and Defendant's wife; (2) one set of 37 interrogatories completed by Defendant in which he detailed in part the times he saw Plaintiff's wife outside of work prior to their divorce; (3) one set of 24 requests for admission completed by Defendant; (4) text messages between Plaintiff and his wife from April to July 2018; and (5) Defendant's Facebook records ranging from September 2014 to April 2018.  Plaintiff's discovery was expansive, and no direct evidence was produced that identified Defendant as Plaintiff's wife's paramour, let alone any circumstantial evidence of pre-separation conduct that could be corroborated by evidence of post-separation conduct.

¶ 94        That all of Plaintiff's pre-separation and post-separation evidence amounts to nothing more than mere conjecture is highlighted by Plaintiff himself in his

deposition:

> Q. I think the last question I asked was how did you come to the conclusion that [Defendant] was the paramour?
>
> A. So in the spring of 2017, she told me that she was dating someone that she worked with.
>
> Q. Okay.
>
> A. *And I put two and two together.*
>
> Q. What do you mean when you say you put two and two together?
>
> A. Well, she was having an affair. She had already told me she was having an affair with someone she worked with. And then she told me that she was dating only a few months after our separation.

(Emphasis added.)

Even considering the evidence in the light most favorable to Plaintiff as the nonmoving party, I would hold that Defendant met his burden of proving Plaintiff cannot produce evidence to support the third element of his alienation of affection claim, especially given that under *Rodriguez*, the type of evidence being proffered gives rise to nothing more than mere conjecture.

### 2. *Criminal Conversation Claim*

To establish a claim for criminal conversation, plaintiff's evidence must establish "the actual marriage between the spouses and sexual intercourse between defendant and the plaintiff's spouse during the coverture." *Brown*, 124 N.C. App. at

380, 477 S.E.2d at 237. Additionally, in a case

> [w]here adultery is sought to be proved by circumstantial evidence, resort to the opportunity and inclination doctrine is usually made. Under this doctrine, adultery is presumed if the following can be shown: (1) the adulterous disposition, or inclination, of the parties; and (2) the opportunity created to satisfy their mutual adulterous inclinations.

*In re Estate of Trogdon*, 330 N.C. 143, 148, 409 S.E.2d 897, 900 (1991) (internal citations omitted). Evidence of sexual intercourse must rise above mere conjecture and "if a plaintiff can show opportunity and inclination, it follows that such evidence will tend to support a conclusion that more than 'mere conjecture' exists to prove sexual intercourse by the parties." *Coachman v. Gould*, 122 N.C. App. 443, 447, 470 S.E.2d 560, 563 (1996).

¶ 97 The issue here is with element two of Plaintiff's criminal conversation claim. Again, Plaintiff has failed to produce any direct evidence *identifying Defendant* as the individual with whom Plaintiff's wife had sexual intercourse with prior to Plaintiff and his wife separating. Plaintiff relies on the same post-separation evidence he argues corroborates the same pre-separation evidence conduct for this claim as he did his alienation of affection claim. Accordingly, for all of the reasons delineated *supra*, I would hold that the evidence does not rise above mere conjecture.

¶ 98 Particularly given that criminal conversation acts almost as a strict liability tort, a plaintiff must produce evidence that *the named defendant* had an adulterous

inclination or disposition and had the opportunity to act in satisfaction of this adulterous inclination. Here, Plaintiff has produced no evidence either post-separation or pre-separation that rises above merely conjecturing that Defendant has such an inclination. Similarly, Plaintiff has produced no evidence either post-separation or pre-separation of Defendant's opportunity to act on his adulterous inclinations. The times Plaintiff demonstrated that Plaintiff's wife and Defendant were together prior to the separation occurred at work or in the setting of work gatherings—all spaces where other people were present. The only other pre-separation evidence that even touches on opportunity is Plaintiff's testimony in his deposition that his wife took solo vacations. Plaintiff, however, provided no evidence of when or where these vacations took place, let alone evidence that Defendant was present at these vacations or even away from his own home during the same timeframes.

¶ 99          Therefore, even considering the evidence in the light most favorable to Plaintiff as the nonmoving party, I would hold that Defendant met his burden of proving Plaintiff cannot produce evidence to support the second element of his criminal conversation claim, and the evidence offered only gives rise to mere conjecture of sexual intercourse between Defendant and Plaintiff's wife.

## III.    Conclusion

Plaintiff's allegations for both claims lack adequate evidentiary support. Mere conjecture is insufficient to withstand summary judgment. As Defendant met his burden of showing that Plaintiff cannot produce evidence to support the third element of his alienation of affections claim and the second element of his criminal conversations claim, I would hold that the trial court properly granted Defendant's motion for summary judgment and would therefore affirm the order of the trial court.